May it please the court, Leonard Goodman. I represent Mr. Odeh. We're going to split the time, Your Honor, and I'm going to address the issue of the government's breach of the amended plea agreement and the effect of the appellate waiver. Mr. Nash is going to address the issues related to his client, Mr. Hussain, and also the issue of acceptance of responsibility. This case presents a somewhat unusual factual circumstance. We have a plea agreement which contains a stipulation about guideline loss numbers and an appellate waiver. Represented by new counsel, Mr. Odeh files a motion to vacate that plea agreement. Then he reaches a new agreement with the prosecutor, the terms of which are not in dispute. This new agreement says that Mr. Odeh agrees to withdraw his motion to vacate the guilty plea. And in exchange, the government agrees to effectively amend the plea agreement to allow Mr. Odeh to challenge the amount of loss. This was essentially an oral agreement, although it was memorialized in a written filing by the defendant. At the outset of the sentencing hearing, the prosecutor broke his promise not to object to Mr. Odeh's presentation of evidence challenging the loss. In a lengthy speech spanning more than three transcript pages, the prosecutor expresses his frustration at both of the defendants, both of these men, for agreeing to a loss calculation in excess of $1 million. And then going back on that agreement. These comments were a breach of the amended plea agreement and they poisoned the entire proceedings because, as we show in the brief, the sentencing judge issued nearly every single ruling under the false impression that both of these defendants had broken their promise not to challenge loss. In response, the government makes two arguments. First, it argues that the failure of Mr. Odeh's counsel to make a timely objection to the government's breach at the sentencing hearing is fatal and precludes even plain error review in this court. As we set forth in our reply brief, the government cites two cases, United States v. Hare, a 2001 case from this court, and United States v. Hicks, a 1997 case. As we set forth in the reply brief, the government's narrow reading of these two cases, which they say would preclude any plain error review, conflicts with this court's decision, a 2015 decision, in United States v. Navarro. United States v. Navarro is directly on point. In that case, there's also a plea agreement with an appellate waiver. The government breaches the plea agreement at sentencing. The defense attorney fails to object. This court reverses on plain error review and finds that reversal is required because it is likely that the defendant would have received a lower sentence but for the breach. The prejudice to these defendants is even more clear than in the Navarro case. In this case, at least with respect to Mr. Odeh, he was contemplating a sentence of 51 months in the plea agreement and ended up with nearly three years more, a sentence of 85 months. The government's second argument is that Mr. Odeh has taken the prosecutor's comments at the beginning of the hearing out of context. Essentially, what the government argues is that all of those comments were only directed at Mr. Nash's client, none of them were directed at Mr. Odeh, and therefore there was no breach. We've set forth the prosecutor's comments in the reply brief on pages 5 and 6, and it's clear that they're directed at both defendants. But if there's any doubt about that, we would ask the court to focus its attention on the district court's response to the prosecutor's comments, which is in the reply brief beginning on page 7 and in the transcript at pages... And it is clear from the judge's response that he understands that the prosecutor is saying that both of these defendants are acting in bad faith for putting on this evidence after stipulating to the amount of loss. And then even more telling is the judge's response at the very end of the hearing, at the second day of the hearing, when finally defense counsel speaks up and says, no, judge, we agreed, the prosecutor agreed that we could put on this loss evidence, and the judge's response is, hold on a second, I'm having a hard time, show me where it is. So it's clear, I see that I'm into my rebuttal time, if there's no questions. Well, my thought is that it's clear from the record that the judge was operating under this false impression for the entire hearing, he ruled against the defendants, he found that their loss challenge, rejected their loss challenge, found that acceptance responsibility was inappropriate for both, while under that misimpression. Thank you. Mr. Nash. Thank you, judges. I represent Kay Hussein, the second defendant. The first question that the government raises with regard to my client is that it agreed to an amendment of the plea agreement and the stipulation facts as to loss, as to Mr. O'Day, but not as to my client. The fact is that he did agree in the district court to allow my client to go forward, and the judge said, you may go forward and join the challenge to loss. It's inconceivable that that would not entail an amendment to the plea agreement and the stipulation. Since the loss is the loss, whatever it may be, there could only be one loss, it could not be different for the two clients, whether the government's estimate is taken or whether the defendant's estimate is taken. The district court could not sentence Mr. O'Day on a loss of, say, $300,000 or $400,000, which the defendants had put forward, and then say, no, Mr. Hussein is bound by the stipulation of the plea agreement. He's entitled to an accurate figure as to loss, and that was what was attempting to be figured. The next is that the burden, because of what the prosecutor said at the very beginning of the hearing, put the defendants on the burden of proof. The burden of proof as to loss is the government's, always has been, and is today. And yet the judge said that notwithstanding what the pleading said about the experts that defendants were attempting to call to show a reconstruction of the books and an analysis of the income and what other stores did, that that was a bare denial. A bare denial is set forth in this court's decision in Hussein, I'd add no relation, at least that I know of, that was quoted by the court and relied upon by the government. This court's decision in Hussein says, regarding the denial there, the lawyer contended without explanation, challenging the figure. The next time the court spoke, the defendant presented no evidence. That's what the Hussein court said. And the third thing that the court said in Hussein was, counsel asserted without explanation. Here, we put on three experts, who the court had the wherewithal to decide that the government was more accurate than we are, but the issue is not who's right, the issue is whether we were presenting a frivolous denial of the lost figure, and we weren't. We put three experts on the witness stand, the government cross-examined them, actually the cross-examination was longer than the direct examination. But the whole thing got off on the wrong foot when the prosecutor said that this is a breach, not by just me, but by both clients of the plea agreements. It was not. The challenge was not frivolous. The indictment itself pointed out that the tax returns on which the government's loss estimate relied were false and not reliable. So the government's figure by itself is suspect and subject to scrutiny. And all we did was try to present the court with a better way to estimate the loss. The government's agent on the witness stand said the books were in such a way that they were not able to tell how many fraudulent sales there were and how many legitimate sales there were. So is this where the judge took away, on this reason, because of that dispute, took away the acceptance of responsibility? Well, that's on page 44 of the second day of the transcript. Actually, the judge had presaged his denial of acceptance of responsibility. When he said it was a bare denial and the prosecutor spoke then about the breach, the judge said, I want to alert you now that this looks like a frivolous challenge to loss and acceptance of responsibility is in the balance. And then when he finished all the evidence, he sent the parties out to see if they still wanted to continue with the challenge, I guess. And that acceptance of responsibility was in the balance. In fact, the judge had prejudged our evidence without ever hearing a witness testify. I see my time is up. I'd like to save a moment for rebuttal. Thank you, Judge. Thank you, Mr. Nash. Mr. Killian? Thank you. May it please the court. Good morning. My name is Randall Killian. I represented the United States down below, and I represent the United States here today. Sitting through the opening part of counsel's argument, I know that they were not present during the hearing, but I don't know what sentencing hearing they're referring to, because what occurred was not what happened down below. This case is a three-year case, a food stamp fraud that led up to a two-day sentencing. There are a number of different lawyers that have been outlined in the briefing. Some 11 days before sentencing, an individual by the name of Adam Fine withdrew, and Mr. Bradshaw, Tom Bradshaw, entered on behalf of Mr. Oda. Then, after that, Tom Keefe, who's an attorney in Southern Illinois, was replaced just shortly before sentencing again with an individual by the name of William Daniel. The first thing that I want to start out, because I think it's important to lead off, and that is under Hare, there's a plea agreement, there is a stipulation, and there is a waiver. That should be the end of it. The next is under United States v. Hicks. If the government breaches, which the government did not do, if the government breaches, then under United States v. Hicks, it's incumbent upon the defendant, the defendants in this case, to say, wait a minute, your honors, the government is breaching their plea agreement. Let's fix this. Now, with regard to the government's opening statement, and I'll be it, there was some frustration on the part of the government because there had been a number of lawyers, and this challenge to loss was relatively new. This was my, your honors, and if there's any question, read the whole thing in context, in addition to what Mr. Bradshaw, the attorney for Mr. Oda, says after my opening remarks. My opening remarks were to put into context to the court what all of the agreements were. And the agreements were very simple. Mr. Goodman argues that the defense filed a motion to withdraw his plea. There has never been a motion to withdraw a plea. There was a motion to withdraw from the stipulation in the plea agreement because Mr. Bradshaw was saying, wait a minute, they believe that the loss number is less. So that motion was, in fact, filed. I had discussions with Mr. Bradshaw. The theory was that his client could not speak English, and therefore he did not understand the $1.6 million loss amount that had been talked about for three years. That both defendants with their clients had been in our office multiple times. 1.6 never changed. But now, right before sentencing, 1.6 is not the correct amount. So what I did at the beginning of the sentencing is I basically outlined, judge, there was a motion to withdraw from plea and stip from one defendant, Mr. Oda. The government, to save time, has agreed that we will allow him to put on this new loss number. If we're wrong, the government's wrong. Let him put the loss number on. We did not agree to allow him to withdraw the stipulation. We did not agree to allow him to withdraw from any other portion of the plea agreement. It was to put on the loss number. Then, after all, and in fact, I say, I've got Mr. Bradshaw's number on my speed dial. I've talked to him so many times about this, saying, are you sure you want to do this? Because there is a stipulation. Because the way we've calculated is conservative. There is a danger that the judge will find, this is a conversation with Mr. Bradshaw, there is danger that the judge will take away acceptance. And I said that. I didn't poison the well. I told the court exactly what I had told Mr. Bradshaw. Now, with regard to Mr. Hussain, Mr. Hussain, three days before sentencing, for the first time, says, hey, I want to join in on the party, and I want to also challenge the loss. The government did not agree. In fact, the government said, look, we've got this agreement with one defendant. We have separate plea agreements with separate terms. The plea agreement with Mr. Oda agreed to a certain guideline recommendation from the government. A separate plea agreement with Mr. Hussain with a separate guideline recommendation from the government. Two lawyers, two defendants, they were treated differently three days before Mr. Hussain comes in and says to his attorney, we want to challenge too. I put on the record, and just to clarify, I want to make it perfectly clear, we never said Mr. Oda breached. In fact, we never said Mr. Oda breached all the way through until the very end, where he decided to open his mouth again and start lying. And we set that out in our brief, and I hope I have time to cover it today. But with regard to the breach, and counsel has pointed out how this opening statement by the government poisoned the judge, poisoned everybody, but this is what I say at the very end, and it's on document 236, page 15 of 207. It says, be aware that now challenging a negotiated element of the plea, a loss element where the United States has never agreed to allow it, this defendant, Gais Hussain, one defendant, that is a breach of the plea agreement. I never talked about Mr. Oda because I told the court all the way through that with regard to Mr. Oda, we had an agreement to allow him to put on loss. I want to say one additional thing with regard to that because it completely blows out the argument that somehow I was attaching both defendants together. The person who was in the courtroom who best understood the agreement and best understood what I said was the attorney for Mr. Oda. This is what he said, and I apologize for reading from the transcript, but it's document 236, page 19. After I have finished, Mr. Bradshaw says, Your Honor, I think I understand Mr. Killian's frustration about dealing with this case for several years. Let me just say preliminarily that I think quite a bit of credit is due to Mr. Killian and Mr. Coonan for that matter and their offices for taking this approach of allowing us to put on this loss evidence because I think it's incumbent upon the court to determine the amount of loss even if the parties stipulate the amount of the loss if there is other evidence. What the court goes on to do, make no mistake about it, Mr. Bradshaw knew, everybody in the courtroom knew that our agreement only dealt with Mr. Oda. It did not apply to Mr. Hussain. Mr. Bradshaw even complimented us for that. With regard to what the judge said, the judge's statement is fair. There's a written stipulation. They raised their hands before a judge and said, This is the loss amount. And now they're coming in and it's a danger. You roll the dice. And they rolled the dice. And two days of sentencing, if any fair-minded person reads the transcript of that sentencing, there is no way that you can conclude that the judge was in error in determining that the loss calculation was frivolous. With regard to the acceptance, the judge says, Look, there's a written stipulation. Fine. If it's wrong, it's wrong. But we've got two days of sentencing now. I determined, the judge here, using a common-sense analysis based on all the evidence that was presented, that it was frivolous. And with regard to why it's frivolous, there's some language in the brief that states that the government knew before the sentencing that what the evidence was going to be. That's not true at all. We knew we had the Mr. Bradshaw allowed us to talk to their two certified public accountants. Certified public accountants are great. They do great things with numbers. The problem is we didn't know the basis for their numbers. They had a person by the name, an accountant by the name of Weiss, who testified. She testified that she was employed by the defendants. She testified that she came up with a cost of goods that was utilized by these two very skilled, certified public accountants. Ms. Weiss's numbers, the court later said, junk in, junk out. Our brief talks about bank accounts. And I apologize for that because maybe it puts too much emphasis on bank accounts. The real world was that the accountant for the defendants got her information for determining cost of goods from the defendants. That's how she come up with her cost of goods. She never contacted the government. We knew of other places they were getting goods. We knew places where they were using Snap Cards, the money on Snap Cards, to go out and purchase items from vendors, Sam's and other places. Those could not have been calculated into our cost of goods. You mean people gave them their Snap Cards? Your Honor, unfortunately, we have places like East St. Louis which are characterized as food deserts. There's places where you can't go anywhere else. So the Department of Agriculture gives food stamps. In this case, they're called Snap Cards. But what happens is the individuals who are the most vulnerable have $100, $200, $300 on this Snap Card. They'll go into businesses like Garden Grill 1 and Garden Grill 2, which was the subject of this case. They'll take it, and the defendants, individuals such as Guy Sussane and Maj Deoda, will then take advantage of that. And what they'll do is you hand them their Snap Card, they put in their number, they take maybe $100, $200 of value off that card, and then they give them $0.50 on the dollar, $0.40 on the dollar. They pay them cash. So the kids who are home who aren't getting food or WIC vouchers, this case was also about WIC vouchers, this is all about transferring government benefits to cash in a way that most benefited the defendants. You finish up because I want to ask you something. No, go right ahead, sir. No, it's about that, but I want you to go on with this. Well, the next thing that I wanted to talk about was with regard to the acceptance, and it goes into the whole issue of the court finding that the defendants' loss calculations were, in fact, frivolous. Of course, that's a clear error. There's great deference given to the court. The court in this case had multiple reasons to take away acceptance. Not only did the court have two days of evidence that the court listened to and determined was frivolous, but also the defendant, Hussein, had had an obstruction where oftentimes acceptance is taken away. In addition to that, at the very end of the sentencing prior to the court imposing sentence and the government making its recommendation, the defendant, Najdi Odeh, lied multiple times. It's minimized in the brief of the appellant, but just so the court knows, the government stuck with the plea agreement as to Najdi Odeh all the way through. You will never hear the government say that the defendant breaches plea agreement. The only thing we say with the acceptance is, Judge, hey, with regard to acceptance, you know. We're not going to argue for or against it. We're sticking with the plea agreement. It wasn't until the very end where the defendant said that Geis was mostly in New York. That was false. Geis was mostly at the stores there in East St. Louis. He said he opened the stores to help keep and feed the kids. That was false. Wouldn't invest if he had known how violent East St. Louis was. That was false. He continued, even as of that sentencing, to invest in East St. Louis. He blamed his employees. That was false. He minimized his roles. He made it sound like this whole thing was Geis. The fact of the matter was, and the court heard the evidence, that Najdi Odeh was the money man. He's the one that on the receipts, when someone would bring a card in and get cash, he instructed the employees to write the amount on top of it. So he was probably the most culpable out of both of the defendants, yet he sat there and tried to minimize his own role at the very end when he's talking to the judge. He also said, if I spoke English and I understood the laws, that I wouldn't be here today. And that has been as bogus at the beginning as it is today. We were prepared, and one of the reasons I suspect Mr. Bradshaw withdrew his motion to withdraw from the plea in the stip was because we told him, we let him know, hey, there's been revenue agents in that's talked to this guy. We had an IRS agent in that came in, a supervisory IRS agent, who came in and talked to this defendant. He speaks English. There is no way that three years down the road, this defendant now miraculously did not understand the plea agreement that had been entered into between the government and his prior counsel. Now, back to what this happens. It's really shocking that they can run up $1.6 million without somebody catching them and stopping them. It is a very difficult thing, Your Honors. With regard to the government trying to do that, of course, these businesses oftentimes deal in areas where it's difficult for law enforcement to become involved. It's a tough place. It's hard to infiltrate. And the other question I have is are the people who trade these SNAP cards and WIC cards and everything else in for cash, do they ever get punished? Your Honor, in some instances they are. In most instances we allow the Department of Agriculture and Food and Nutrition System to deal with them. It's a double-edged sword. Because they just keep going. Well, it's a double-edged sword. It seems to me at some point they ought to be cut off. I don't disagree with you, Your Honor. But, however, in the big picture, with limited resources, it doesn't happen unless you have Gysus, you have Gysusanes and Majdeotas in the world. If they don't exist, that type of activity doesn't occur. But it just seems that maybe even in East St. Louis, the word would get on the street, you do that, you don't get any benefits. I know that sounds like pretty harsh. But until people learn that they can't get away with it, I happen to talk to some people personally who say, well, you know, when you get $700, you don't need all that. Well, the SNAP card. And then they say it's okay to have cash. I see my 15 minutes is up. I have a number of other things that I wish I could have talked to. This is outside the record of this, but I'm really wondering why this continues like this. And it's why it's so vulnerable, so easy, I should say, easy to do this. Program related fraud. And we have 45% of the people are in food stands. That's correct, Your Honor. And program related fraud is one of the most difficult to prosecute. That's why when you have a case, you try to get as much general deterrence as you possibly can. There are a number of different issues. I think that they're adequately covered in our brief. If there's no further questions, thank you. All right, thank you, Mr. Gillian. Mr. Goodman. I'd just like to respond to two points Mr. Gillian raised. First, he argues that the government never said that Mr. Oday breached the plea agreement and that the government fully advised the court that the agreement had been amended to allow Mr. Oday to challenge laws. And I would direct the court to pages 7 and 8 of our reply brief, pages 15 to 17 of the transcript from the first day of the hearing. This is the court's response to Mr. Gillian's expression of his frustration. The court begins with, here's my reaction to what you said. The court then mentions the binding plea agreement. Mr. Gillian responds, The plea agreement entered into by both, the parties both agreed to both a loss calculation in excess of $1 million and both agreed to it. The court asks, is it a plea agreement? Mr. Gillian says, yes, it's a plea agreement, not semantics. It's an agreement between the parties that the government can argue is breached. That was his words back then. It's clearly accusing both defendants of acting in bad faith by bringing this loss challenge and it poisoned the entire hearing, your honors. And it's not correct what he's saying to refer to this stipulation. Yes, they entered into a stipulation, but the amended plea agreement says specifically that Mr. Oday was not bound by that stipulation. It's no longer part of the plea agreement. It's as if the parties agree to disagree about the amount of loss. That was the situation when the hearing started and Mr. Gillian, with all due respect, misrepresented that situation to the court, and badly. And the court ruled against the defendants under that misapprehension on every single issue. Now this is important, Mr. Goodman. Yes. I want to get these so that my notes match up with your comments. I want you to give me the language of Mr. Gillian that you say, it's your words, misrepresent what occurred. Yes. I would refer to, because the lengthy statement that he gave, the three-page statement, is very confusing. But I think if you look at the court's reaction. Well, we'll have to deal with it. I've read it, so. If you look at the court's reaction to that, and that's where I'm saying page seven of our reply brief. I know what the court said. I know what Ms. Gillian says. I want you to tell me where misrepresentations were made by an AUSA to a United States District Court judge. Mr. Gillian says the plea agreement entered into by the parties both agreed to both a loss calculation in excess of one million, and both agreed to it. That was not a correct statement. That loss stipulation had been set aside with respect to Mr. O'Day. That was the amended plea agreement. And, in fact, they had agreed to disagree about loss. That was not a correct statement. Was that the combined loss? Yes. Yes, the loss was the same for both defendants. Okay, well, that's, one has not taken the burden of the other. Correct. All right. But Mr. Gillian's statement is both. They both agreed to this. They're now challenging it. And the prosecutor goes on to say it is an agreement. Well, at one point in time, they did both agree. That's true. There's no question. So there's a temporal issue here, I suppose. And when he's making that statement, what is he referring to? Is that pre the new stipulation or what? Well, what it's clear what the judge's interpretation of it is. Because when we look at the second day of the hearing, after the judge has ruled against the defendants, found that their loss challenge, rejected their loss challenge, found that Mr. Hussein had not accepted responsibility and was about to find that Mr. O'Day had not accepted responsibility. At that point, defense counsel finally speaks up and says the government, and this is on page 28 of the appeal brief, the government, this is Mr. Bradshaw, says the government agreed that we could present the amount of loss, and that part of the agreement was that Mr. O'Day would be entitled to the benefit of acceptance responsibility as set forth in the plea agreement. And we haven't done anything different than what was agreed to. The judge's response to that, and this is near the end of the hearing, is okay, hold on a second, I'm having a hard time. Show me where it is that you agreed in the plea agreement. And then Mr. Bradshaw explains that the plea agreement was amended. Yes, there was this stipulation, but it was amended, and it was set aside with respect, at least with respect to Mr. O'Day. He was allowed to challenge loss. The judge, this is clear. He was allowed because of the stipulation to allow the amendment to the plea agreement. We don't have that with Mr. Hussein, right? Well, I'm not, according to Mr. Nash, yes, Mr. Hussein joined into the challenge two days before, but I'm only representing Mr. O'Day. It's clear with respect to Mr. O'Day that that stipulation was set aside. He was not bound by that stipulation. As they began the sentencing hearing, there was an agreement to disagree about loss. And for Mr. Killian to stand up and accuse the defendants of acting in bad faith, both defendants, he clearly uses the word both, was a disingenuous argument to the court. It was not accurate. As to the waiver, we've got case law which allows us to reach it even, though that's normally not the case. We feel these issues are better resolved before one district judge than three appellate judges. And your position, Mr. Goodman, is what, with regard to why this wasn't brought, this confusion that you say exists, particularly in the mind of the judge, this wasn't brought to the attention of the district judge? Well, Judge, we can see that a proper, timely objection was not made. It was brought to the attention of the judge, but at the very end of the hearing and after the judge had already ruled against the defendants, but this is exactly on point with the Navarro case, Your Honor, and that's a 2015 decision. It's the exact same facts. You have the two waivers, the appellate waiver and then defense counsel drops the ball and doesn't make a proper objection when the prosecutor breaches. And this court looked at it under plain error review and said, yes, it's likely that the defendant's sentence was enhanced by the government's breach and therefore we must reverse under plain error standards. We have the same situation here. We have a defendant O'Day's sentence is 34 months greater than what was anticipated in the plea agreement. Of course this goes back. He's exposed to could be more, right? Well, pretty much the loss calculation is maxed out by the government's numbers. You know, the total amount. Well, I suppose the government's open. Can you reopen this? The government's going to reopen it, I suppose. That's true, Your Honor. And I assume your client's aware of that. He's aware of it. But the total amount of SNAP receipts is not in dispute. It was 2.2 million. The government basically said three-fourths of those were fraud. The defense said different. So it can't, you know, yes, you're correct. The defense also agreed to a four-level managerial enhancement, both defendants. So, yes, a resentencing, of course, anything can happen. But these numbers are quite harsh against both of these defendants. And they are asking for a remand and a resentencing. Thank you, Your Honor. Thank you, Mr. Goodman. Mr. Nash. If I could address Your Honor's question. It's clear from the transcript in the district court that the assistant U.S. attorney, in his frustration of dealing, as he explained here today, although none of it's in the record except for what he says, but I accept it at face value, he had dealt with many lawyers. He's dealing with a terrible situation from his point of view, and I understand that. And he's frustrated. He had signed plea agreements. He had signed stipulations of fact regarding laws. But when the defendant O'Day filed a motion to withdraw from the plea agreement and from the stipulation, he agreed that there could be a challenge to laws. There's no question that that laws, that agreement had to apply to both the defendant on accurate information. He's constitutionally entitled to that, and that means laws. So the laws was going to be what it was. So it had to be as to both. And he says very specifically to the district court on pages 14, actually it starts at page 10 with the judge's reaction, and goes through page 17. And the part that Mr. Goodman read to you, it's right there in the transcript on those pages, and it's on page 7 of our reply brief. I understand Mr. Killian's frustration, but the fact is that he let the court think that there were plea agreements and that they were being breached, and stipulations, and they were being breached, and he had agreed otherwise. Now, Mr. Hussein wants to join O'Day's challenge, right? Correct. But that's with no agreement to modify his plea agreement. It was not mentioned. Correct. So is he breaching at that point? It's understood, Judge. There can't be a challenge to laws by one, because there can't be a different loss for one and the other. The two stores created the fraud run by both the brothers. So there's just one loss, whatever it may be. So the loss has to apply to both of them. So if, for instance, it's not an agreement to amend my client's stipulation of fact and plea agreement, could the court then find that the loss was $350,000 and sentence Mr. O'Day on the basis of that loss, but hold my client to the plea agreement and the stipulation when, in fact, the court has determined that the loss is $350,000, can't be sold? But you would agree it would probably be a lot cleaner if the defense lawyer had just sought the same relief that O'Day was seeking. That's an understatement, Judge. If you'd been the district judge and Mr. Goodman and I had been the lawyers, we wouldn't be here. Thank you. I understand. Thank you, Mr. Nash. Thank you, Mr. Gilland. Thank you, too. Thank you. Mr. Goodman. Case is taken under advisement.